UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
UNITED STATES OF AMERICA                         :
                                                 :
                                                 :
       -against-                                 :      MEMORANDUM OPINION
                                                 :
PATRICK CICALESE et al.,                         :      11-CR-00027 (ENV)
                                                 :
                       Defendants.               :
                                                 :
                                                 :
------------------------------------------------------------------- x

**VITALIANO, D.J.**

In an indictment unsealed on January 20, 2011, Patrick Cicalese was charged with one count of obstruction of justice in violation of 18 U.S.C. §§ 1512(c)(2) and 3551 et seq. and one count of perjury in violation of 18 U.S.C. §§ 1623(a) and 3551 et seq.[1] On December 6, 2011, Cicalese filed an omnibus motion to dismiss the charges, to suppress certain evidence, and for other relief. The Court heard oral argument on March 23, 2012 and that day denied all of defendant's requests except the motion to dismiss. That branch of the motion was grounded in the argument that the question posed to Cicalese at the grand jury, and upon which the charges against him rested, was fundamentally ambiguous. Given that issue, the Court reserved decision and directed the parties to submit further briefing. After the supplemental briefs were submitted, a renewed oral argument was held on April 25, 2012. At the hearing, for reasons stated on the

---

[1] On December 14, 2011, a superseding indictment was filed adding a criminal forfeiture allegation.

1

record in open court, the Court granted Cicalese's motion to dismiss the charges against him.[2] This memorandum opinion further explains the Court's reasoning.

## BACKGROUND

The charges against Cicalese were the aftermath of his January 28, 2010 appearance before a grand jury sitting in this district. Cicalese had been subpoenaed to appear in the course of the grand jury's investigation into suspected waterfront-related rackets involving the Genovese organized crime family. Cicalese was at the time an official of the International Longshoremen's Association ("ILA"). Not a target of the underlying investigation, Cicalese's testimony was sought to demonstrate mob infiltration on the docks.

A key portion of Cicalese's testimony before the grand jury focused on his interactions with Stephen Depiro, an alleged member of the Genovese crime family currently under indictment in the District of New Jersey, United States v. Depiro, Cr. No. 10-851, for alleged racketeering on the docks where Cicalese was an ILA official. After establishing that Cicalese and Depiro were long-time friends because they grew up in the same Newark neighborhood and still socialized, the prosecutor asked several questions about discussions and meetings they may have had with each other. The charges against Cicalese are based on the following examination before the grand jury:

Q(1): When did you last see Depiro?

A: Last week.

Q: What was your occasion for seeing him last week?

A: Socially.

---

[2] Because the obstruction of justice charge was based solely on defendant's alleged perjury before the grand jury, it could not survive dismissal of the perjury charge. (Oral Argument Tr. at 30:20-22, 74:3-14, Mar. 23, 2012).

2

Q(2): Do you socialize with him regularly?

A: From time to time, you know, if I am – not really regularly, but I may run into him from time to time.

Q: When you say you might run into him who do you mean?

A: We may frequent the same restaurants. If I happen to be there, he walks in, if he happens to be there, I walk in; something like that.

Q(3): When was the last planned meeting that you had with Mr. Depiro?

A: There was only one. [Cicalese then described a birthday dinner for Depiro that Cicalese and his wife attended.]

Q(4): Just to be clear, you said you had only one planned meeting with Stephen Depiro, that's one planned meeting with Stephen Depiro in your life?

A: I don't know about my life.

Q(5): How about within the last year, how many planned meetings have you had with Stephen Depiro?

A: Maybe a couple.

Q(6): So you had the planned meeting where you were talking about going to dinner; did you ultimately go to dinner?

A: Yes. [Cicalese then explained that the restaurant was in Hoboken and the dinner was in early October.]

Q(7): And after that early October dinner meeting, did you have any other planned meetings with Stephen Depiro?

A: I don't think so. I don't recall.

Q(8): Isn't it true you saw Mr. Depiro on November 8th?

3

A: I might have.

Q(9): When was the last time you spoke with Stephen Depiro on the telephone?

A: I don't remember, I don't remember.

Cicalese was then asked a few additional questions about telephone conversations with Depiro. Thereafter, the following colloquy took place:

Q: Do you have any knowledge of Stephen Depiro's position in organized crime?

A: No.

Q: Did you ever discuss port-related business with Stephen Depiro?

A: No.

Q(10): Have you ever called Stephen Depiro to run things by him?

A: No.

**Q: Have you ever arranged a meeting with Stephen Depiro to run things by him?**

**A: No.**

(Grand Jury Tr. at 39:8-42:15, Jan. 28, 2010, Ex. C to Def. Mem.)

The government's theory in its prosecution of Cicalese was that, in the final (bolded) question and answer, Cicalese falsely contradicted statements he made during a November 8, 2009 phone call with Depiro, which had been intercepted pursuant to a court-authorized wiretap:

Depiro: [. . .] So what's going on, Pat? Everything alright with you?

Cicalese: Yeah, well I just wanted to see you. I wanted to run a few things by you. You know I wanted to see if I could like run into you.

Depiro: Yeah, I'll catch up with you, uh, Pat. Let me see uh Thursday Thursday.

Cicalese: I just wanna make sure you know the way things are going you know...

Depiro: Yeah.

(Telephone Call Tr. at 2-3, Nov. 8, 2009, Ex. P to Def. Mem.)

Depiro and Cicalese then continued to discuss the logistics of where and when to meet, eventually seeming to settle on a breakfast meeting at a diner scheduled for the following day, November 9, 2009.

Critically, the government concedes that the meeting at the diner referenced in the intercepted conversation never came off. (Oral Argument Tr. at 32:14-15, Apr. 25, 2012.) With covert operatives of the FBI watching every move, Cicalese arrived at the diner, but Depiro never showed up. (Aff. of Special Agent John Penza ¶ 78, Dec. 5, 2009, Ex. B. to Def. Mem. ("Penza Aff.")) After a wait, Cicalese called Michelle Caruso, Depiro's girlfriend, in another intercepted conversation on her monitored phone, to ask her whether he (Cicalese) was at the right location. (Telephone Call Tr., Ex. B. to Def. Supp. Mem.) Caruso called Cicalese back a few minutes later and suggested that Cicalese meet Depiro at a further-unidentified Dunkin Donuts. (Oral Argument Tr. at 54:2-7, Apr. 25, 2012.) The FBI surveilled a nearby Dunkin Donuts, but did not observe a meeting. (Penza Aff. at ¶ 78.) The government contends that it is possible Depiro and Cicalese met at a different Dunkin Donuts in the area, but has no direct proof that Cicalese and Depiro met as Caruso had suggested or anywhere else that day. (Oral Argument Tr. at 40:5-18, 43:4-25, Apr. 25, 2012.)

## LEGAL STANDARDS

"Perjury requires that a witness believe that the testimony he gives is false." United States v. Lighte, 782 F.2d 367, 372 (2d Cir. 1986). "[W]hether the witness believes that an answer is true or false generally turns on the declarant's understanding of the question." Id. Though normally an issue for the jury, where the government's line of questioning is "fundamentally ambiguous, the answers associated with the questions posed may be insufficient

5

as a matter of law to support the perjury conviction." Id. at 375 (internal quotation marks omitted). A question is "fundamentally ambiguous" if it pivots on a phrase that "'is not a phrase with a meaning about which men of ordinary intellect could agree . . . .'" Id. (quoting United States v. Lattimore, 127 F. Supp. 405, 410 (D.C.D.C. 1955), aff'd per curiam by an equally divided court, 232 F.2d 334 (D.C. Cir. 1955)). Nonetheless, in determining whether a question is fundamentally ambiguous, it is necessary to analyze the testimony as a whole rather than isolating individual questions or phrases. Id.; United States v. Markiewicz, 978 F.2d 786, 808 (2d Cir. 1992).

"Precise questioning is imperative as a predicate for the offense of perjury." Bronston v. United States, 409 U.S. 352, 362 (1973); United States v. Landau, 737 F. Supp. 778, 781 (S.D.N.Y. 1990). The Supreme Court has held that in a perjury prosecution, it is the government's duty to ensure that its questions are sufficiently precise, because the Court could "perceive no reason why Congress would intend the drastic sanction of a perjury prosecution to cure a testimonial mishap that could readily have been reached with a single additional question by counsel alert - as every examiner ought to be . . . ." Bronston, 409 U.S. at 358. "The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." Id. at 360 (internal citations omitted).

## DISCUSSION

Viewed in both the context of the witness's grand jury examination and of the extrinsic proof of falsehood, the question at issue is fundamentally ambiguous. Cicalese could easily have understood the prosecutor's question in more than one way depending on his understanding of the phrase "have you ever arranged a meeting." The inquiry expressed through that phrase could have been understood to refer only to the process of arranging a meeting, regardless of whether a

6

meeting actually occurred. The phrase "have you ever arranged a meeting" just as easily could have been understood to be an inquiry only about a meeting that was planned by Cicalese and that did take place as planned. It could also have been understood to exclude a meeting that occurred but whose logistics were "arranged" by someone other than Cicalese. Given the ordinary, reasonable, but divergent potential understandings of the question, Cicalese would run the risk of being found guilty of perjury despite truthfully answering to one understanding of the question, but still convicted by extrinsic evidence that contradicts the answer when analyzed in conjunction with one of the other understandings of the same question.

To make matters worse, the government's offer of proof of falsehood was as ambiguous as the question posed to Cicalese. At the first oral argument, the government took the position that the meeting referenced in the phone call never happened. (Oral Argument Tr. at 22:10-13, Mar. 23, 2012.) In its supplemental brief and at the renewed hearing, the government changed course, stating that the meeting may have happened at a time and place other than as discussed in the intercepted conversation. (Government Letter Br. at 3-4, Apr. 6, 2012; Oral Argument Tr. at 31:15-20, Apr. 25, 2012.) The position was muddled further when the government proffered as evidence that a meeting did occur the transcripts of three phone calls between Cicalese and Caruso on November 9, 2009. (Oral Argument Tr. at 52:21-54:9, Apr. 25, 2012.)[3] In these conversations, Caruso directed Cicalese to a location different from the one at which he had been waiting to meet Depiro. While the calls do not establish that a meeting between Depiro and Cicalese did take place, they do indicate that, if a meeting did occur, the logistics of where and when to meet had been arranged by Depiro (as communicated through Caruso) and not by

---

[3] The government read the transcripts of all three calls into the record at the Apr. 25, 2012 hearing. A transcript of the second call is also attached to Defendant's Supplemental Memorandum of Law as Exhibit B. The first and third calls are not elsewhere in the record.

Cicalese. The government then claimed the right to go to trial on its moving pick strategy, that is, to force Cicalese to defend his "No" answer regardless of which version of the "truth" the government ultimately concluded it could best prove. Pointedly, what it surely could establish prima facie at trial was that, notwithstanding whether a meeting ever actually came off, Cicalese had attempted to arrange a meeting with Depiro to be held on November 9, 2009. Yet, inquiry about whether Cicalese attempted to arrange such a meeting is the one concise, simple, unequivocal question that, for whatever reason, the government chose not to ask him when he appeared before the grand jury.

Of course, the presence of some ambiguity in a question's meaning is not automatic grounds for a dismissal. In assessing whether it is, the question, as noted above, must be viewed in the context of the testimony as a whole. Lighte, 782 F.2d at 375. The context of the grand jury testimony surrounding the disputed question only adds to the already toxic level of ambiguity evinced by the plain meaning of the question's phrasing. The question followed a long string of questions posed to Cicalese predominantly about meetings and contacts with Depiro that were more than just planned – they actually occurred. Indeed, in the series leading up to the key question, the prosecutor asked at least ten separate questions, numbered 1-10 above, seeking information about meetings and phone calls that had taken place between Depiro and Cicalese. The prosecutor then asked about a meeting which did not occur as planned, if it occurred at all. When the government asks a series of questions about one topic, then follows that series with an ambiguous question intended to point the witness in another direction, fundamental ambiguity may often result. See Landau, 737 F. Supp. 778, 781-82 (questions that asked whether defendant "ever" took certain actions meant to elicit information about June of 1983, which followed a question about defendant's actions prior to March of 1983, were

fundamentally ambiguous because they did not specify the June timeframe); see also Lighte, 782 F.2d 367, 376 (where two questions were asked about defendant in his personal capacity, the question that followed could not be interpreted to be asking about defendant as a trustee without including more specific language); United States v. Serafini, 167 F.3d 812, 820-21 (3d Cir. 1999) (although a broad question about checks in general might have been sufficiently clear standing alone, in the context of several questions asking about a specific check, the disputed question was fundamentally ambiguous).  Here, given the context of the preceding questions, Cicalese readily could have thought the prosecutor was asking yet another question about whether he had actually met with Depiro.  With such contextual understanding, if no meeting with Depiro had occurred, Cicalese truthfully answered "No."

As the Court noted on the record at the April 25, 2012 hearing, if the government had indicated it could provide evidence that a meeting between Cicalese and Depiro had occurred on November 9, the question to Cicalese at the grand jury about an actual meeting would not have been out of context.  The question would still be subject to multiple interpretations and therefore ambiguous, but not fundamentally ambiguous.  Given extrinsic evidence of a meeting, a reasonable jury could conclude that Cicalese had knowingly lied.  A reasonable jury might alternatively conclude that Cicalese did not lie because it found that no meeting occurred, or that Cicalese had not lied because the meeting that did occur was arranged by Depiro and/or Caruso and that Cicalese reasonably understood the question to refer only to a meeting he had personally arranged.  However, absent actual evidence that a meeting had occurred on November 9, no jury could conclude beyond a reasonable doubt that Cicalese had lied because the question, in that context, is fatally imprecise.  United States v. Razzaia, 370 F. Supp. 577, 579 (D. Conn. 1973).  Put differently, without evidence Cicalese met with Depiro, no reasonable jury could conclude

9

beyond a reasonable doubt that Cicalese knowingly answered falsely, because he easily could have understood the phrase "arranged a meeting" to refer to a meeting that had occurred as planned by Cicalese. The government claimed that it could make a valid prima facie case that Cicalese lied regardless which of the three mutually exclusive versions of falsehood it managed to prove at trial, and notwithstanding the multiple understandings and testimonial context of the target question. Against such a flood of ambiguity, no defendant could reasonably be expected to defend and no reasonable jury could convict.

Succinctly, the prosecutor did not fulfill her obligation to "pin the witness down to the specific object of [her] inquiry." Bronston, 409 U.S. at 360. Any number of straightforward follow-up questions could have clarified the object of inquiry. For example, in addition to the "attempt" question mentioned earlier, the government could have cured the ambiguity by supplying the date, time or location of the target meeting, focusing Cicalese's attention on the specific events at issue. See Razzaia, 370 F. Supp. 578-79. Left naked, the government's imprecise question did not meet the standard set in Bronston. It cannot provide a jury with a sufficient basis to reasonably conclude that Cicalese willfully lied by answering as he did. Id. at 579. Asking simple follow-up questions could have resolved the imprecision and fulfilled the government's obligation under Bronston. Whether by strategy or inadvertence, the government did not do so.[4]

---

[4] The government argues that it was not required to ask follow-up questions, primarily relying on United States v. D'Auria, 672 F.2d 1085 (2d Cir. 1982) and United States v. Regan, 103 F.3d 1072 (2d Cir. 1997). The argument is a red herring. These cases do not deal with Bronston issues, but instead hold that the government is not required to reveal evidence it has in its possession that contradicts the witness's testimony. The government was, of course, not required to play the intercepted call or otherwise reveal the fruits of its investigation or its investigatory methods. It was however, required to ask specific questions, and neither Regan nor D'Auria relieves the government of that obligation -- an obligation it could easily have met without revealing a scintilla of its investigatory file.

10

## CONCLUSION

As the Second Circuit has explained, "[a] perjury conviction must rest on the utterance by the accused of a false statement; it may not stand on a particular interpretation that a questioner places upon an answer." Lighte, 782 F.2d at 374. Here, the government sought to try Cicalese based on its favored interpretation of an ambiguous question that lacks support in the context of the examination during which the question was asked or in the context of the government's nebulous extrinsic evidence of falsehood. Under such circumstances, the perjury charge lacks the precise predicate necessary to sustain it. Therefore, the two counts in the indictment against Cicalese -- the obstruction count and the perjury count on which it stands – must be, and have been, dismissed.

Dated: Brooklyn, New York
May 30, 2012

s/ ENV
_____
ERIC N. VITALIANO
United States District Judge